```
             UNITED STATES DISTRICT COURT
            CENTRAL DISTRICT OF CALIFORNIA
           (WESTERN DIVISION - LOS ANGELES)
```

STARZ ENTERTAINMENT, LLC,     ) CASE NO: 2:20-CV-04085-DMG-KSx
                             )
             Plaintiff,      )           CIVIL
                             )
    vs.                   )     Los Angeles, California
                             )
MGM DOMESTIC TELEVISION       )   Tuesday, September 21, 2021
DISTRIBUTION, LLC,           )
                             )
            Defendant.      )

```
                DISCOVERY CONFERENCE


     BEFORE THE HONORABLE KAREN L. STEVENSON,
        UNITED STATES MAGISTRATE JUDGE
```

**APPEARANCES**:           SEE PAGE 2

Court Reporter:         Recorded; Wave

Courtroom Deputy:      Gay Roberson

Transcribed by:         Exceptional Reporting Services, Inc.
                           P.O. Box 8365
                           Corpus Christi, TX 78468
                           361 949-2988

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

2

**APPEARANCES**:


For Plaintiff:          J. WESLEY EARNHARDT, ESQ.
                       Cravath Swaine & Moore, LLP
                       Worldwide Plaza
                       825 Eighth Avenue
                       New York, NY 10017

                       STEVEN M. GOLDBERG, ESQ.
                       Markun Zusman Freniere Compton, LLP
                       3 Hutton Centre Drive
                       9th Floor
                       Santa Ana, CA 92707

For Defendant:         JAGANNATHAN P. SRINIVASAN, ESQ.
                       MINAE YU, ESQ.
                       Gibson Dunn & Crutcher, LLP
                       333 South Grand Avenue
                       51st Floor
                       Los Angeles, CA 90071

1    **Los Angeles, California; Tuesday, September 21, 2021**

2                    **(Remote appearances)**

3                        **Call to Order**

4        **THE CLERK:**  Calling Case Number CV-20-04085, Starz

5    Entertainment, LLC versus MGM Domestic Television Distribution,

6    LLC.

7            Counsel, please state your appearances for the

8    record.

9        **THE COURT:**  Starting with the plaintiff.

10       **MR. EARNHARDT:**  Good afternoon.  Wes Earnhardt from

11   Cravath Swaine and Moore on behalf of Starz.

12       **THE COURT:**  Good afternoon.

13       **MR. GOLDBERG:**  Good morning, Your Honor.  Steven

14   Goldberg, Markun Zusman Freniere Compton, also on behalf of

15   Starz.

16       **THE COURT:**  Good afternoon, Mr. Earnhardt, and good

17   afternoon to you, Mr. Goldberg.

18           And for the defendant.

19       **MR. SRINIVASAN:**  Good afternoon, Your Honor.

20   Jay Srinivasan for defendant, MGM.

21       **THE COURT:**  Good afternoon to you, Mr. Srinivasan.

22   And I understand Ms. Yu is also on the line, but she won't be

23   making a formal appearance.

24           All right.  This is the time the Court has set for

25   further -- it's actually not the time the Court has set for

4

1    further discovery status conference in this matter.

2           The first thing I want to do is apologize to all of

3    you.  I have a very, very significant state habeas petition

4    case where I had an evidentiary hearing scheduled for 10:00

5    o'clock last week in the morning.  I thought it might go until

6    about noon.

7           The gentleman is serving a life sentence, and there

8    were many more witnesses to put on; we went well and quite late

9    into the afternoon, so my sincere apologies for bumping you

10   folks, but yes, his life took precedence over your discovery;

11   that's all I can say.

12           **MR. EARNHARDT:**  Absolutely.

13           **THE COURT:**  All right.  Great.

14           Meanwhile, I have your -- this is one of our periodic

15   discovery conferences set in this case, and I also ruled on

16   your motion to compel and gave you some further meet and confer

17   assignments to do, and to the extent that may be unfinished or

18   unraveled, or unsatisfactory, we can talk about that as well.

19           I have your status report prepared in anticipation

20   for today's conference, and I will say it sounds to me, maybe

21   I'm delusional, but it sounds like you've made some progress.

22   Things are moving, put it like that.

23           So, let me first hear -- let's talk about the joint

24   status report first, and then if there's any holdover items we

25   need to address from the motion to compel from the follow-up

1   instructions I gave you regarding the motion to compel in terms

2   of particularly narrowing the scope of some of the requests

3   that the Court found extremely broad or otherwise

4   objectionable, let's talk about those second.

5           So, let's start with the report, and let's hear from

6   Starz.

7           **MR. EARNHARDT:**  Well, you know, Your Honor, from

8   Starz's perspective, I don't think there's much to discuss in

9   the joint status report other than a couple of issues that

10  remain after what I think would be correctly characterized as a

11  productive meet and confer.

12          **THE COURT:**  Okay.

13          **MR. EARNHARDT:**  We took Your Honor's instructions and

14  order seriously.  We had a two and a half hour meeting on

15  Friday, September 10th.  I'm not going to say we are now in

16  full agreement on every issue.  You know, the devil will be in

17  the details on how some of the conceptual agreements we made

18  will be executed, but I do think we've gone a long way in

19  reaching compromises to resolve many of MGM's objections.

20          From Starz's perspective, there really are just two

21  issues to discuss today, and the first is there is one sort of

22  overarching objection that MGM has made --

23          **THE COURT:**  Yes.

24          **MR. EARNHARDT:**  -- related to the scope of what

25  pictures should be subject to discovery here.  And we would

1    like some guidance from the Court.

2            I think both parties agree we're at impasse on that

3    issue, and we would like some guidance from the Court on

4    exactly how to tee that up because it does -- it relates to,

5    you know, maybe a dozen different discovery requests.  So --

6            **THE COURT:**  All right.  Let me -- okay.  Let me ask

7    you this.

8            My understanding is the library agreement, and

9    there's an addendum to it that was attached, I believe included

10   some discovery requests in order to avoid any ambiguity that

11   certainly was (indisc.) of film and television episodes was

12   attached to the complaint.

13           From your standpoint, Mr. Earnhardt, what is the

14   dispute about what pictures are involved?  Because it seems the

15   four corners of the contract is really straightforward, but go

16   ahead.  Am I missing something?

17           **MR. EARNHARDT:**  Okay.  Yeah, no, we agree with that,

18   Your Honor, but I think just a bit of context.

19           So, from our perspective, this is a straightforward

20   breach of contract case.  We -- Starz had two agreements with

21   MGM.  The library agreements pursuant to which MGM gave

22   exclusivity to Starz regarding 761 pictures.

23           We believe that's the scope, the appropriate scope on

24   discovery because our claim is that MGM breached that contract

25   by violating exclusivity by giving those pictures to others at

1   the time Starz should have had it.

2          We know there were some breaches, and we were able to

3   identify some of them with specificity in the complaint because

4   we were able to figure it out through publicly available

5   information or through information we received from MGM.

6          What's left, and the reason we need discovery here,

7   is we don't know the extent to which MGM breached that

8   contract.  We were able to identify in the complaint 344

9   pictures that we believe had been breached, and we identified

10  those with specificity, but we don't know whether the remaining

11  220 -- 217 pictures were also breached.

12         And so, our view is exactly as Your Honor described

13  it, the relevant scope of discovery is the pictures that were

14  licensed in the contract that we identified with specificity in

15  the complaint and what the, you know, what this case is about.

16         And I think it's a pretty simple question.  You know,

17  under the Federal Rule, the question is, is the discovery

18  sought relevant, and is it proportional to the needs of the

19  case.

20         Well, there's nothing more relevant in a breach of

21  contract case than discovery that would be the very act of

22  breach.  So, if we -- if there are license agreements pursuant

23  to which one of the pictures in the library agreements were

24  licensed to a third party when Starz should have had

25  exclusivity, that's not only relevant to breach, that's breach.

1          So, it doesn't get more relevant or more proportional

2    than that from our perspective.  And the last point I'll make

3    is this is not a hypothetical that we think there could be more

4    evidence of breach out there.  To date, MGM has produced

5    license agreements that explain about 49 out of the 344

6    breaches we know exist, so there's a lot left to be produced in

7    that regard for the ones that were on Exhibit A that there's no

8    dispute over.

9          But even in that small production, a small production

10   of about, you know, a couple dozen license agreements, there

11   are nine additional pictures that we didn't know about when we

12   filed the complaint that we now know they breached.

13         And so, this is not a fishing expedition, it's not

14   hypothetical, it's not taking a guess.  We know there are

15   additional breaches out there.  The only question is how many,

16   what were the terms, what happened, and that's the core

17   discovery in this case, and we don't think we should be limited

18   in the discovery we seek because before we filed the complaint,

19   we were able to be very specific about what we knew at that

20   point in time had been breached already.

21         **THE COURT:**  All right.  Thank you very much.  Let's

22   start there, Mr. Srinivasan, and we've had previous discovery

23   conferences where counsel for defense has said, "Yep, we know

24   there were some collisions".  They were described as

25   "collisions".

1          As a matter of contract principle, why aren't they

2     entitled to discovery about the subject matter of the contracts

3     that are being disputed, because they don't have to prove 771 -

4     - they don't have to bring 771 cases, complaints to prove that

5     the contract was breached.  If the subject matter of the

6     contract is in dispute, why is it not appropriate, relevant,

7     and not -- and proportionate, I should say, for MGM to produce

8     the information about all of the films that are subject to the

9     -- to all of the production pieces?  I'll put it like that,

10    because they're not all films, that are subject to the

11    agreement.

12          If there were no collisions, and there were no cross-

13    licensing, and no evidence of alleged, you know, alleged

14    violation of exclusivity agreement, well, there is nothing

15    there, but certainly to the extent you've got a contract about

16    these various works -- production works, the Court is really

17    straining to see why MGM should not be ordered to produce it

18    all -- for all that was subject to the library agreements that

19    are the foundation of this lawsuit.

20          Go ahead, Mr. Srinivasan.

21          **MR. SRINIVASAN:**  Sure, thank you, Your Honor.  And

22    the answer really is there's a few reasons that I would like to

23    go through.

24          First of all, each one of these titles, each one of

25    these pictures in the agreement is almost a contract to itself,

10

1    right?  It's a separate window, it's a separate license

2    agreement -- I mean, it's a separate fee.  And for that title,

3    there are, you know, potentially dozens, scores of competing

4    licenses.

5            And so, this isn't a typical situation where you say

6    we have an agreement that covers a single subject matter and,

7    you know, if there's a breach, it's very easy for us to go

8    through our records and identify, you know, if there is a

9    breach or evidence related to that breach.  Here, we --

10           **THE COURT:**  Well, hold on, Mr. Srinivasan.

11           **MR. SRINIVASAN:**  -- yeah.

12           **THE COURT:**  So, the path you're going down goes,

13   "Well, because it's hard and it's complicated, we shouldn't

14   have to -- we're not going to have to face any allegations of

15   potential liability for because it's too hard to find out".

16   That's not the law.

17           **MR. SRINIVASAN:**  And that's not -- I'm sorry, Your

18   Honor, that's not the complete argument here.  I'm just setting

19   the table --

20           **THE COURT:**  Okay.

21           **MR. SRINIVASAN:**  -- that this isn't the typical

22   burden versus probative value analysis.  There's a heavy burden

23   to research each one of these titles, a burden that we're

24   incurring for hundreds of these titles already.  I just wanted

25   to set some foundation.

11

1          But when -- but there's another aspect to this case

2     which is, we went through the agreement and, even before this

3     lawsuit started.  In fact, the vast majority of the titles at

4     issue in this picture -- excuse me, in this lawsuit, are titles

5     that we provided them, that we gave them nearly 240-odd titles,

6     240 exactly I think it was, that we said we think is at issue.

7          In other words, we didn't say to them, go rely on

8     what's out there publicly, and you're on your own, sorry, and

9     you don't get discovery into anything more.  We did a bunch of

10    work before this case even started, and they then got those

11    titles.  They added them to their complaint, and they said they

12    found a hundred more.

13         And there is case law, I believe, that we cited in

14    the context of the joint motion to compel, that I don't think

15    the Court reached that issue, that does suggest that when you

16    have a obligated contract like this, discovery is appropriately

17    limited to the breaches at issue, and you don't get to explore

18    every aspect of that contract.

19         **THE COURT:**  But you do get to explore every aspect of

20    the material that is the subject of the contract for potential

21    breach.

22         **MR. SRINIVASAN:**  We agree, Your Honor, and that's why

23    we look at each title separately, and --

24         **THE COURT:**  Did you look at all 761 though?  Because

25    there are more titles that are -- there are more titles that

1    are the subject of the agreement than -- they don't only have a

2    claim as to the ones you tell them you know you breached.  The

3    contract is a contract that's enforceable on its full face.

4         **MR. SRINIVASAN:**  And Your Honor, you know, we

5    obviously appreciate your comments on this.  We did do some

6    research, and we believe that we do have some basis that in a

7    case again where there are various aspects to an agreement, and

8    the degree to which a plaintiff has to come forward and say

9    this is the breach we're alleging.

10        I appreciate Your Honor's comments that you believe

11   that a breach with respect to certain titles may cover arguably

12   breaches of others, and we'll certainly take that onboard as we

13   analyze this issue, but for us, we do believe we're justified

14   in limiting it to the titles that they've alleged are at issue

15   which, by the way, are mostly titles we provided them.

16        So, this isn't a hide the ball --

17        **THE COURT:**  That seems -- that seems like a really

18   upside-down approach to a contract lawsuit.  Honestly.

19        You get to sue on the ones we tell you get to sue on,

20   no matter what the contract says.  And then, but you're not

21   allowed to know whether or not the alleged violative conduct

22   extended beyond what we're willing to tell you about.

23        I'm sorry, Mr. Srinivasan, I'm not persuaded here.

24   There may need to be more briefing, and I want to see the case

25   law on this because this does not sound right.

13

1          **MR. SRINIVASAN:**  Understood, Your Honor, and we'll,

2     like I said, we will regroup in light of your comments, and see

3     where, you know, we'll look at the case law again,

4     understanding again, you know, your thoughts on the matter, and

5     see if this is something we want to continue to pursue or if

6     we're willing to reconsider our position on this.

7          I think at the very least, one of the things that we

8     would suggest is that this be prioritized.  I mean, to a

9     degree, that's happening already currently, because we're

10    focusing on the licenses of the titles that they have actually

11    alleged --

12         **THE COURT:**  Right.

13         **MR. SRINIVASAN:**  -- and that has taken months for us

14    to find the agreements.  And we're, you know, we can think

15    about that.  We think that that makes sense to do.

16         **THE COURT:**  No, I don't disagree with you that the

17    parties should move forward with the discovery that has been --

18    that is -- has already been produced and is emerging and has

19    been identified.  The fact that discovery may unfold in stages,

20    there's always in complex litigation.  There are the things

21    that are sort of at the top of the pile, at the top of the

22    heap, readily identifiable, witnesses readily identifiable,

23    files and records readily identifiable, but everybody's

24    obligation, as you folks are well aware, is your discovery

25    obligations are ongoing.

14

1          So, to the extent additional information is

2     identified and located, it has to be produced to you.  So, I

3     don't disagree with you about the prioritization of what you

4     have identified, what is already on the table, what has been

5     produced, but I do believe Mr. Earnhardt makes a fair point

6     that to the extent you are producing documents with new titles

7     in it already, it kind of begs the question about the rest.

8     Okay.

9          **MR. SRINIVASAN:**  And just on that point, Your Honor,

10    we disagree with Mr. Earnhardt on that.

11         **THE COURT:**  Okay.

12         **MR. SRINIVASAN:**  We -- I disagree with Mister --

13         **THE COURT:**  Big surprise.

14         **MR. SRINIVASAN:**  -- I know.  I disagree with his

15    characterization of the number of titles we've produced on --

16         **THE COURT:**  Okay.

17         **MR. SRINIVASAN:**  -- and that that has disclosed other

18    breaches.  I did want to add that.

19         **THE COURT:**  Fair enough.

20         **MR. SRINIVASAN:**  That's fine.  It just doesn't sound

21    like that's germane to your thoughts.

22         **THE COURT:**  Right.

23         **MR. SRINIVASAN:**  But at least for the record, we

24    don't think what we've produced so far has unearthed additional

25    breaches nor have the parties really engaged on that issue.

1          **THE COURT:**  Okay.

2          **MR. SRINIVASAN:**  But I, you know, just for the

3    record, I am noting that.

4          **THE COURT:**  Okay.  Here's what -- on this issue.

5    Because it is found -- hang on, Mr. Earnhardt.  Don't jump out

6    of your chair; you're going to get a chance now.

7          What I'd like to do, because it is sort of

8    foundational to the scope of what remains -- remaining

9    discovery that's going to get done, and it permeates the metes

10   and bounds of some of the other requests.

11          On this now issue of whether or not it is -- MGM

12   should appropriately be required to produce information about

13   any of the titles that are the subject of the library

14   agreements which are at the heart of this litigation, I would

15   like to see very short, concise letter briefing with stated

16   authority, and I want to get them say, by Monday.

17          And it's not cross-briefing.  You're going to each

18   submit your statements and your authorities.  I think I

19   understand your positions from today on that, but I'm

20   particularly interested in this authority Mr. Srinivasan is

21   citing saying that, you know, there is cited case law,

22   hopefully from the Ninth Circuit, that if it's a complex

23   contract, you only get to ask about a few things, not the whole

24   thing.

25          I'm -- if I'm skeptical, I don't mean to be snarky

16

1    about it, but I'm just telling you, I want to see the

2    authorities and I want to see your argument in black and white.

3            And Mr. Earnhardt, similarly to you.  I want three-

4    page letter briefing -- file it though.  Even though it's a

5    letter brief, please file it so it's on the docket, CM/ECF by

6    Monday.

7            We want to get -- because we need to get certainty

8    and closure on this foundational issue before we get much

9    further down the road with the discovery conferences and the

10   analysis of discovery burden particularly.

11           Does that seem -- let me ask Mr. Srinivasan, does

12   that seem fair and equitable, Mr. Srinivasan?

13           **MR. SRINIVASAN:**  Your Honor, we're happy to do that.

14   I do want to give some context to this whole idea of discovery

15   about these titles just so Your Honor --

16           **THE COURT:**  Put it in your briefing.

17           **MR. SRINIVASAN:**  -- oh, sure.  And what I mean by

18   that is, so every one of these pictures, you can imagine a

19   James Bond film, for instance, is licensed by MGM all over

20   the world for all sorts of formats.  You know, so, in other

21   words --

22           **THE COURT:**  Understood.

23           **MR. SRINIVASAN:**  -- there's licenses there, literally

24   hundreds of licenses there.  What we have done for the pictures

25   at issue, and I just want to make sure that you understand, and

1    this would be something we would do for the ones that aren't at

2    issue, is we look at those cross-licenses because -- and some

3    we can easily cross off.  If it's a deal in China, it's not at

4    issue in this case.  If it's a deal for a motion picture

5    format, it's not at issue in this case.

6             And then when we then eliminate those things, and

7    then we're looking at U.S. territory agreements within the time

8    period on formats at issue, if there is no collision, meaning

9    the window doesn't overlap, we haven't been producing those

10   materials, because it's a -- because there's hundreds of those,

11   it's very difficult for us to find all of those and produce

12   agreements that we know on their face do not implicate this

13   lawsuit, but where there are agreements that, you know,

14   arguably could suggest there was an infringement, we have been

15   producing.  That's what we have been doing for the titles in

16   the lawsuit.

17             I would just hope that we -- if we could use that

18   same juristic; otherwise, we will have hundreds of titles that

19   they're not alleging for which there is no collision, but for

20   which we have hundreds of agreements --

21             **THE COURT:**  But then don't they have to then take

22   your word for it?  Discovery doesn't work that way.  You say,

23   we looked, we didn't see anything.  We don't know nothing about

24   nothing on this picture.

25             That's not how discovery works.  If there are no

```
1   collisions, maybe -- I'm going to be a little creative here.

2   Maybe, I don't want to make you give them their work product,

3   but if there are 761 titles that are ultimately sort of the

4   omnibus subject matter of the library agreements, and you've

5   done the analytics to figure out, well, China doesn't matter,

6   Bulgaria doesn't matter, 2012 doesn't matter, then I think what

7   they're entitled to is a -- they need to know about the titles

8   that are the subject of the contracts.

9           And maybe we can be a little bit more creative

10  without a disclosure of attorney work product, but I don't

11  think as a matter of discovery principle in a contract case

12  like this, where it's identifiable subject matter of the

13  agreement, even though it's complicated, it's expansive, it's

14  very intricate, they have to take your word for it.  Well, no,

15  we didn't find one about the Three Little Bears.  Or no,

16  nothing ever happened with Gone with the Wind, or whatever it

17  is, whatever the title might be.

18           MR. SRINIVASAN:  Yeah.

19           THE COURT:  I just -- I'm not sure that is not a

20  standard the Court is comfortable with today, but I want to see

21  what you have to say about it.

22           I cut you off, Mr. Srinivasan.  Finish (indisc.).

23           MR. SRINIVASAN:  I appreciate you giving me plenty of

24  time.  I have one suggestion, and we just emailed actually

25  counsel this morning, or this afternoon just before the
```

19

1   hearing, in response to their query as to whether we have a

2   database that sort of tracks this information, and the degree

3   to which maybe that database would, you know, which does track

4   a lot of information.  One idea is to do some queries on that

5   database that would include all the titles --

6           THE COURT:  Okay.

7           MR. SRINIVASAN:  -- as a starting point to show,

8   here's some data about these different agreements.  You can see

9   that the data is not revealing a, you know, our database, the

10  one that the company relies on, is not revealing a collision,

11  as sort of a first step; something along those lines.  But I

12  think -- my point is, we don't need to hash that out today.

13          THE COURT:  Right.

14          MR. SRINIVASAN:  But perhaps a middle ground that

15  doesn't require us to go and look for every agreement with

16  respect to all these titles.  We have been doing this now for

17  over two months just for the titles at issue, just for

18  agreements where there's collisions, and it's taken, you know,

19  basically, fulltime some MGM employees now almost three months

20  to get about two-thirds of the way through the process for the

21  titles just even at issue.

22          And so we, you know, there is a heavy burden and time

23  commitment to this, but perhaps we can find middle ground.

24          THE COURT:  All right.  I'm -- I think where you're

25  going is kind of where I was going.  And well, and nothing

1  sticks and stone.  I don't want to commit anybody to, you know,

2  going over to inspect anybody's database today.  That is not

3  what I'm saying.

4       But I think there is maybe a more creative, but more

5  thorough way to get at some of this information.  It may -- I'm

6  not at all convinced that there aren't any of those 761 titles

7  where likely there are no collisions.  There is no alleged

8  violation, there may be no cross-licensing in which, you know,

9  we put that in another bucket.  But right now, my point is, as

10  a matter of principle, I don't think the plaintiff has to just

11  take the defendant's word for it on a lawsuit of this size,

12  scale, complexity, and ultimate value.

13       So, Mr. Srinivasan, I really appreciate you sort of

14  being willing to push and pull with this a little bit, and at

15  least maybe imagine a more creative way to get at this in terms

16  of a fulsome scope so that when this case is resolved, the

17  issues related to the validity and the performance and/or

18  breach of the library agreements is put to bed entirely, you

19  don't want them back here on the other 250 titles going, but

20  you didn't tell us about these.  So, now we've got a new

21  lawsuit for breach as to those pictures.

22       All right.  Mr. Earnhardt, can I hear from you?

23       **MR. EARNHARDT:**  Yes, Your Honor.  I have to say I

24  appreciate the attempt at creativity.  I'm very concerned --

25       **THE COURT:**  Nothing's decided.  Nothing's decided.

21

1          **MR. EARNHARDT:**  -- yes.  And I just want to explain

2    my concerns with the approach and, frankly, with what I'm

3    hearing.

4          So, on the one hand, we're told that before the

5    lawsuit was filed, MGM went through the process of determining

6    which of the 761 titles were breached, and was upfront with

7    Starz and gave us that information.

8          But on the other hand, we're being told that it's an

9    extraordinarily burdensome process just to find the license

10   agreements pursuant to which these titles were licensed to

11   other parties, and they're not all the way through it despite

12   knowing about this issue since November of 2019.

13          I don't see how both of those things can be true.  If

14   they've looked at all of the contracts then, you know, then

15   just give it to us, and we can look at them, too, if they've

16   found them.  If they haven't found them, well, that's a

17   problem.

18          The second issue is, the idea of using that database

19   to determine where the infringements occurred, that's -- I

20   think that's what got us here because when Starz went to MGM

21   and said, hey, we're noticing that our pictures are on

22   platforms that they shouldn't be during times they shouldn't

23   be, MGM told Starz, "Well, it's because our database doesn't

24   work.  It's flawed, there's a flaw in the system.  We're trying

25   to fix it".

22

1   So, I don't have any confidence, frankly, that using

2 the database that led to the infringements would be an

3 effective way to conduct discovery.

4   Instead, I think the only way to get to the bottom of

5 what's happening here, and what has happened, is to produce to

6 us, so we don't have to take their word for it, because that's

7 not how discovery works, to produce to Starz the license

8 agreements within the geographic boundaries that potentially --

9   **THE COURT:**  And timeframe.

10   **MR. EARNHARDT:**  -- and timeframe that potentially

11 could be an infringement.

12   This will not surprise you, but Mr. Srinivasan and I

13 disagree about a lot in this case, and what he sees as not an

14 infringement sometimes we see as an infringement, and we should

15 be able to try that in front of a jury to decide who's right,

16 not have them unilaterally decide that this title wasn't

17 infringed on this day because of some technicality that we

18 disagree with.

19   So, I think making an initial scope --

20   **THE COURT:**  All right --

21   **MR. EARNHARDT:**  -- based on geography makes total

22 sense.  They produced us a bunch of documents -- a bunch of

23 library agreements that are not in the geography we care about.

24 We don't want those.  Give us -- you can make a cut based on

25 geography that's in play, based on the time that's in play --

1          **THE COURT:**  Let me ask you -- Mr. Earnhardt, let me

2     ask you this.  What is the geography that's in play from your

3     standpoint?

4          **MR. EARNHARDT:**  The United -- it's listed in the

5     library agreements.  There are specific U.S. territories

6     listed.  I'm going to butcher them if I try to name them, but

7     in general, it's the United States and certain protectorates,

8     the Virgin Islands, Bahamas --

9          **THE COURT:**  That's okay.  Samoa, Guam, okay.

10         **MR. EARNHARDT:**  Yes.

11         **THE COURT:**  All right.  And what --

12         **MR. SRINIVASAN:**  Can I just --

13         **THE COURT:**  -- and what -- I'm not -- and this is --

14    I'm not going to hold you to this as an order that you've got

15    to take up to the Ninth Circuit.  I want to get a sense of the

16    scope here.

17         And what from the plaintiff's standpoint is the

18    relevant time period?  The effective date governed by the

19    contract, correct?

20         **MR. EARNHARDT:**  Exactly.  And the reason it's a bit

21    tricky is because there are overlapping but coextensive

22    exclusivity periods for the different films.

23         The easiest way to think about it is the first one

24    starts in 2013, the last one ends some point in the future.

25         So, there's -- if you try to find months in which

24

1    there's no possibility of an infringement because there's no

2    exclusivity there, it -- I'm not saying there's not a single

3    month that doesn't exist, but it may be like a handful.

4         So, the easiest thing to do from our perspective, and

5    look, we will then have the burden of sifting through the

6    agreements to determine whether there is any breaches or not.

7    You know, we are willing to do that because we truly believe

8    there is more out there and that we don't have the full scope

9    of what's happened here.  I think --

10        **THE COURT:**  All right.  Let me ask you -- let me ask.

11   I'm interrupting you again.  I'm an equal opportunity

12   interrupter.

13        Let me ask you this, too.  What is -- what are the

14   relevant platforms?  Because not everybody is -- Video on

15   Demand isn't relevant to every title; television isn't relevant

16   to every title; Amazon Prime isn't relevant to every title.

17   You know, there is a universe, when does that (indisc.) to all

18   761 titles?  Mr. Earnhardt, and then I'll hear from

19   Mr. Srinivasan.

20        Because that is an important delimiter here as well.

21   If the picture you're arguing about under the library agreement

22   was never ever intended to be on Amazon Prime or on Starz, you

23   know what I mean, it's off the table, too, because there's no

24   collision there.  Starz did its thing and -- at a different

25   time and a different territory, and on Amazon Prime, and ne'er

1   the twain shall meet, then we don't have a collision.  If that

2   is the case.  I don't know.

3          **MR. EARNHARDT:**  Yes, so we don't know all the

4   platforms.  We know a --

5          **THE COURT:**  Were there specific -- but Starz has its

6   own streaming, you know, mechanism and distribution channels

7   so, do you know what the universe of those are?

8          **MR. EARNHARDT:**  No, no.  This is -- yeah, this is

9   very important.  When Starz had exclusivity, it was supposed to

10  be on Starz period.  It could have been on Starz linear, it

11  could have been on Starz Video on Demand, it could have been

12  Starz on Amazon, it could have been -- but it should have been

13  on Starz period.

14          So, if instead it was YouTube, that's a breach.  If

15  it was on Amazon, that's a breach.  If it was on HBO, that's a

16  breach.  If it was on, you know, Nickelodeon, that's a breach.

17  Anywhere else that it would have occurred when Starz had been

18  given those exclusive rights, that would be a breach.

19          Now, we know some of the platforms on which the

20  breaches occurred.  We know that a lot of them occurred on

21  Amazon -- a lot of them occurred on Amazon, but there are also

22  other platforms.  And we can't -- you can't know what you don't

23  know.  So, until we are able to look at the license agreements

24  and look at the platforms with whom MGM contracted to give

25  rights to these pictures when they should have been only on

1   Starz, wherever Starz was, but only on Starz, only then will we

2   know the full scope of the breaches and the full scope of where

3   the breaches occurred.

4          **THE COURT:**  Okay.  So, let me see if I'm

5   understanding you correctly, and this is strictly for my own

6   understanding.

7          It is Starz's position that MGM should have to

8   produce in discovery in this case all licensing agreements for

9   all 771 pictures that were potentially subject to the library

10  agreements, all license agreements for any platform other than

11  Starz, for any distribution channel other than Starz during the

12  time period of the library agreement in the relevant

13  territories of the U.S. and its protectorates without --

14         **MR. EARNHARDT:**  There are -- there are, to be fair,

15  certain holdbacks that are not relevant.  So, to be absolutely

16  precise, we would not need license agreements that are related

17  to theatrical.  So, in other words, with movie theaters, non-

18  theatrical home video.  So, if it was a VHS or a DVD.

19  People --

20         **THE COURT:**  Well, nobody's done that since 1992.

21         **MR. EARNHARDT:**  Well, I'm just --

22         **THE COURT:**  But I understand; I understand.

23         **MR. EARNHARDT:**  So that would be -- they would be

24  allowed to do the -- to do it on that as well.  Electronic cell

25  through, they would be allowed to do the same time as Starz and

1  Pay Per View and so including digital electronic distribution

2  and your video on demand.

3       Now, our clients know what all that stuff means.  But

4  other than what I just said, which MGM held back those rights

5  from Starz and they maintained their ability to license the

6  pictures to those platforms as the same time as Starz --

7       **THE COURT:**  Right.

8       **MR. EARNHARDT:**  -- what you said is exactly right.

9  It would be the United States for the platforms pursuant to

10  which Starz had exclusivity during the time period of the

11  library agreements.

12       And, look, the -- if it's a lot --

13       **THE COURT:**  Well, 761 titles to start with,

14  absolutely it's going to be a lot.

15       **MR. EARNHARDT:**  And the reason that it's a lot --

16       **THE COURT:**  By definition, it's going to be a lot if

17  you want every single contract --

18       **MR. EARNHARDT:**  And, look --

19       **THE COURT:**  -- and license agreement for those

20  titles.

21       **MR. EARNHARDT:**  -- we know MGM breached our rights

22  with respect to 344 of them.  If this was a case about five

23  titles, maybe it would be unreasonable to ask for all of them

24  but we already know that for 344, they breached.  So it's

25  completely -- and we put that in the complaint with specificity

1   precisely because we wanted the Court to always understand the

2   scope of what we're dealing with here.  Something went wrong

3   systematically at MGM.  There is a chance that every single

4   title has been breached because their database wasn't -- their

5   database or their exclusivity system wasn't working.

6           That's what we're entitled to know.  Given the

7   breadth of what we do know, the breach of infringement was

8   here.

9           **THE COURT:**  All right, understood.

10          Mr. Srinivasan, any final comments?  But all of this

11  is the subject matter of the three-page briefing --

12          **MR. SRINIVASAN:**  I understand.

13          **THE COURT:**  -- this narrow scope.  Go ahead.

14          **MR. SRINIVASAN:**  I understand, Your Honor, and I --

15  there are a number of flat misrepresentations that were made

16  that I feel like I have to correct them because it puts this in

17  context.

18          Mr. Earnhardt started out by saying we produced a

19  bunch a titles -- license agreements to him that are outside

20  the territory.  If Mr. Earnhardt is willing to stipulate that

21  they are narrowing the scope of their lawsuit, I'm happy to

22  have them do that.  It's not just the U.S. and certain

23  ancillary territories.  It's the U.S., certain ancillary

24  territories plus the Bahamas, Bermuda and there may be some

25  others.

1          It's in the agreement.  I'm not just -- I didn't just

2    come up with it -- and some of these Latin American deals, as

3    you can imagine.  What we have -- and this gives me an

4    opportunity here to talk about what Mr. Earnhardt has massively

5    exaggerated in terms of what this --

6          **THE COURT:**  That's why I'm asking you guys to brief

7    it.  This is not the oral argument on the briefing.

8          **MR. SRINIVASAN:**  And I think that --

9          **THE COURT:**  I appreciate that you have great

10   disagreements about the facts, the characterization of the

11   facts, the import of some of the facts and even what the facts

12   are as to the scope of the agreements, the scope of the titles

13   that may be at issue.  But go ahead, finish your thought,

14   Mr. Srinivasan.

15         **MR. SRINIVASAN:**  No, I appreciate that, Your Honor,

16   but let me just explain to you why this turns into an

17   unspooling and unwieldy exercise and I think --

18         **THE COURT:**  That's what I've asked you to put in the

19   briefing.  You've explained it to me.  I'm not -- you don't

20   have to disabuse me of the notion.  I just said it.  This is

21   going to be a big deal if it is the appropriate path to go

22   down.  You are aware of it and your clients are aware of it

23   and, honestly, Mr. Earnhardt is aware of it.  I think that's

24   half the reason he wants to do it.

25         **MR. SRINIVASAN:**  Understood.  I just want to give you

1    one piece of context here because these titles, because they

2    include the Caribbean, meaning the agreement between Starz and

3    MGM, when you start talking about colliding titles where

4    there's been an inadvertent licensing elsewhere, that is going

5    to implicate a lot of contracts from Latin America which also

6    sometimes license the Caribbean.

7            And quite frankly, Your Honor, that's the main issue

8    in this lawsuit.  I won't take issue with the other things he

9    said or I won't correct him on the record in light of Your

10   Honor's comments but --

11           **THE COURT:**  Correct him in your briefing.

12           **MR. SRINIVASAN:**  We'll do that in the briefing but

13   let me say this which I think is actually what we're doing

14   which should give the Court some comfort.  One other thing

15   Mr. Earnhardt professed not really understanding the different

16   formats that were implicated here.  They're very easy to

17   understand.  There are a handful of discrete formats.  They are

18   ATV, streaming video on demand, free basic cable, pay cable and

19   subscription-based video on demand.

20           There are -- everything else is MGM's to keep.

21   That's transactional video, some of the things that

22   Mr. Earnhardt listed but there isn't some unwieldy morass.

23   It's a discrete group here.

24           So what we are doing for the titles at issue is

25   exactly what Your Honor has asked us to do.  We have looked at

1    the territories that are at issue, all of the territories, not

2    just the ones that Mr. Earnhardt thinks are in this case but,

3    again, if he's willing to amend, we'll take that.  In just the

4    formats that are at issue, we are able to determine the formats

5    at issue -- it's spelled out in the agreement -- and the time

6    period that's at issue.

7          If a colliding license overlaps in that way, we are

8    producing it.  If there's any ambiguity in the overlap or if we

9    can't read the time period or the term is unclear, we're

10   producing it.  So there isn't anything that touches on what

11   they're doing that we're not producing.

12         And Your Honor is suggesting we might have to do the

13   same process for the ones that they didn't allege which are, by

14   the way, way more than what Mr. Earnhardt said.  The numbers

15   dwarf what's in the case.  If Your Honor asks us to do it,

16   we'll do it but we -- this notion that somehow we're doing

17   something haphazard is not true and the notion that we're

18   somehow being incomplete is not true.

19         What we are trying to do is eliminate the 95 percent

20   of agreements that have nothing to do with this case but, yet,

21   bear on these titles.  I don't want to give a specific number

22   to Your Honor.  I want to be much more careful in what we say

23   to the Court --

24         **THE COURT:**  Correct.

25         **MR. SRINIVASAN:**  -- but we're happy to work with our

1    client and come up with a declaration if necessary to give you

2    a sense of the number of licenses implicated by these titles

3    that we know by looking at the face of the license has nothing

4    to do with this lawsuit because of territory, time period or

5    format.

6            And that's all we're saying because if we're required

7    to search for all of those and produce all of those, we will be

8    here into 2023 and that's with hiring a bunch of other people

9    at MGM.  We are currently looking for just the ones that

10   overlap and it's taking us a long time to figure out because

11   these aren't stored in an organized way at my client.  It's

12   just historically how it's happened.  They're on shelves.

13   They're in random people's emails sometimes or they're in

14   storage rooms.  That's just how it is --

15           **THE COURT:**  The contracts for the licensing

16   agreements of MGM television and motion picture distribution

17   are -- you-all don't know where they are.  They're kind of

18   willy-nilly under the desk in a brown -- that sounds impossible

19   to me, Mr. Srinivasan.

20           **MR. SRINIVASAN:**  The reason, Your Honor, that happens

21   is sometimes these agreements are struck in 2001, earlier and

22   then they get renewed and it's just sort of an email that says,

23   replace these 50 pictures with this one.  And so if you're

24   looking for the actual agreement, in some cases, Your Honor,

25   it's an exercise in going back in time.

1          Finally, just to answer one last thing that

2    Mr. Earnhardt professed confusion over.  We never looked at the

3    agreements.  He somehow believes that we looked at all these

4    agreements before the lawsuit.  We had all of them in a box and

5    then we threw them away and he's surprised that we can't find

6    them now.

7          What we did is we did query this database to get some

8    clues as to where those overlaps might be.  The database,

9    there's nothing systematically wrong with the database.  There

10   was an employee -- this is -- again, none of this is in the

11   record -- in --

12          **THE COURT:**  And I'm not going to weigh in on your

13   database or the guy that ran the database, what's in it or who

14   pushed the button.  That is not germane to today's analysis but

15   I understand you want to correct the representation of

16   Mr. Earnhardt.  But then again, how should he know?  He doesn't

17   work at MGM.

18          **MR. SRINIVASAN:**  Well, no, but he made an affirmative

19   assertion that an employee of ours says our database is totally

20   screwed up and needs to be overhauled.  No such comment was

21   made.  There is no reason to think the database is systemically

22   an issue.  And he did make the assertion and I just wanted to

23   correct it.

24          But the bottom line is I do think we should brief it

25   and I think ultimately however the Court fashions it -- and we

1   trust the Court will fashion something that's staged and

2   reasonable because if it's the whole enchilada, again, I don't

3   want to talk in terms of numbers without knowing it.  I have to

4   go back to my client.  I think it would take years to produce

5   what Mr. Earnhardt wants.

6          **THE COURT:**  All right.  Here's -- this is precisely

7   where -- I think I'm going to go out on a limb here.  I think

8   there's some hyperbolic assertions being made on both sides of

9   this dispute both in terms of what may or may not be the case

10  with MGM's recordkeeping and what may or may not be MGM.  I

11  mean, this is the platinum standard in entertainment

12  production.

13          You're telling me you've got to go look under boxes

14  and on shelves and under people's coasters to find licensing

15  agreements that are the very bread and butter of this

16  international entertainment conglomerate's revenue streams.  I

17  find that a little hard to believe but we're not there yet and

18  that's not what we're deciding.

19          What I would like to see is the briefing from both

20  parties addressing the appropriate scope of licensing

21  agreements that should be produced in light of the alleged

22  violations -- contract breaches that are asserted in the

23  complaint.  And is often the case, when I see both of those, we

24  will see what makes sense because generally the principles of

25  adjudication is somewhere between the two ends of the spectrum

1  here.

2        I think there is likely more to be produced

3  appropriately as relevant and proportional but there's also

4  probably, Mr. Earnhardt, less than you think should -- they

5  should have to dig up and unearth and disclose here.  We are

6  talking about, at the end of the day, two contracts, the

7  library agreements that are closed universes.  They have

8  specific titles, specific territories, specific times.

9        And, Mr. Srinivasan, I really appreciate you laying

10  out that there are five specific platforms for those

11  distributions that are relevant to the agreement.  So let me --

12  and I'm particularly -- Mr. Srinivasan, I'll reemphasize --

13  interested in your legal authorities that say because this is a

14  complex contract, then the discovery can be limited to what the

15  Defendant says they understand the breach to be.

16        **MR. SRINIVASAN:**  Understood, Your Honor.

17        **THE COURT:**  If I sound difficult, I am but I hope you

18  know that I will look very clear-eyed at the parties'

19  positions, arguments and submissions.  And at this juncture, I

20  know you offered, Mr. Srinivasan, to provide an affidavit about

21  how burdensome this might be to undertake any larger scope than

22  this.  I don't think we're there yet.  I want to see where

23  should we start.

24        And, Mr. Earnhardt, the same analysis goes for you in

25  terms of if there are legal authorities that say the allegation

1    of a breach of a contract covers the entire subject matter

2    effectively of that contract, then that is a -- then that's

3    your position and then you need to argue why it is both

4    proportionate and relevant.

5           I don't have any problems with relevance here.  I'm

6    looking at proportionality primarily.  Relevance, if it's in

7    the contract, I can't really argue it's not relevant,

8    Mr. Srinivasan.  But proportionality goes to access to the

9    information, burden of accessing it, relative importance of the

10   issues in the case, et cetera, et cetera.  You folks can read

11   Rule 26(b)(1) as well as I can and I can assure you I do not

12   have it memorized, all of those proportionality factors.

13          So that -- I think we need to get that resolved

14   promptly because that issue bleeds into the scope and

15   completion of a number of other open discovery issues in the

16   case and we need to get our arms around that as quickly as I

17   can.

18          So I started with Mr. Earnhardt about Starz' position

19   and that -- this scoping issue is really quite fundamental, as

20   I understand it, Mr. Earnhardt, to your opposition?

21          **MR. EARNHARDT:**  It is.  The only other issue I would

22   raise relates directly to this which is just the pace at which

23   discovery is proceeding here.  From Starz' perspective, we've

24   been at this now since February.  We've had the case filed

25   since May of 2020.  We've been talking with MGM about this

1   since November of 2019.  And, frankly, just we're a little

2   concerned when we look at the schedule that remains about what

3   we've accomplished.

4        I know we have nine months left until the end of fact

5   discovery under the current schedule but expert reports are due

6   one month after that.  And so what that means from our

7   perspective is we need to have the documents so that we can

8   take the depositions in time for the experts to be able to

9   consider all of that so that they can have their reports in a

10  month later.

11       And I'm just concerned that to date, we've only

12  received less than 2,000 pages of documents from MGM.  We're

13  still debating sort of the fundamentals of what the scope is

14  going to be and we don't -- we just today got their list of

15  custodians for doing custodial searches despite this issue

16  being something we've been talking about for a couple of years

17  now.

18       We still don't have their search-term protocol.

19  We're told they're still in the process of gathering the

20  documents by -- pursuant to which the search terms and

21  custodians would be used to filter.  We're just concerned about

22  how slowly things are moving from our perspective.

23       And so I don't know if it's -- it would be

24  appropriate or worth discussing whether we need an interim

25  deadline for a substantial completion of document production

38

1   just so we know that there's at least enough time to think

2   about doing depositions so that the experts then have time to

3   consider things or whether that's premature.

4          But I did want the Court to be aware that from our

5   perspective, discovery is moving slower than we think is

6   appropriate and that we think is going to get us to the -- to a

7   place where we're not jammed at the end.

8          **THE COURT:**  Understood.

9          Mr. Srinivasan, do you want to respond here before I

10  comment?

11         **MR. SRINIVASAN:**  I do.  And I --

12         **THE COURT:**  This is a big case.  As Judge Gee said

13  before she sent you folks to discovery detention with me, this

14  is a sprawling copyright case.  So some of this is not

15  surprising to me but go ahead.

16         **MR. SRINIVASAN:**  It is a big case, Your Honor, and

17  Mr. Earnhardt has said now a few times in these hearings and we

18  haven't corrected him because we didn't think it would be

19  productive but he's been saying discovery has been sitting

20  around for a couple of years.  I mean, none of that is true.

21  Judge Gee specifically said in her prior orders that the

22  parties agreed that discovery did not have to begin until after

23  she ruled on the motion to dismiss and she started --

24         **THE COURT:**  Right.

25         **MR. SRINIVASAN:**  -- put in the schedule.  That was

1   February.  We then repeatedly met and conferred with them in

2   the spring of this year.  We kept saying to them our positions,

3   lengthy phone calls, I think maybe nine hours of meet-and-

4   confer calls.  We never got a response back to say, hey, we

5   would lay out our objections.  Your Honor saw in the joint

6   submission that we had lots of specific objections that we

7   elaborated on in these calls.  We said --

8           **THE COURT:**  (Indisc.).

9           **MR. SRINIVASAN:**  Right.  And we never got a response

10  back.  We -- they never said, okay, we've taken it on board and

11  we either disagree or okay.  Then suddenly in, I think it was,

12  July, we got a joint motion to compel without any prelude to

13  it.  We just got this thing and, again, we said to them, guys,

14  we don't have a fundamental disagreement on the concepts.  We

15  need to talk.  We need to talk details.  They refused.  They

16  didn't.  They insisted on filing the motion and it came out the

17  way it did.

18          On September 10th, we had this fantastic meet-and-

19  confer that I think both parties agreed was very productive,

20  moved the ball forward in several respects and something that

21  we have been waiting for since the spring.  And we got a letter

22  from them actually this morning summarizing some of the issues,

23  summarizing areas where they may be an impasse, summarizing

24  areas they want to know if we want to change our position --

25  again, a letter we have been asking for since March.

1          So this idea that MGM has delayed is ridiculous,

2    quite frankly, and it's offensive because they bring it up

3    every time.  That said, we are happy to move forward quickly.

4    The reason things have happened recently is because we sat down

5    and talked.  And we weren't going to in a case like this do

6    things piecemeal.  We weren't going to do a custodial

7    production based on certain agreements and then come back and

8    do it again.

9          These are things -- as Mr. Earnhardt knows, he and I

10   personally have done this in other cases.  We negotiate this

11   stuff comprehensively.  Now they want to open up the ocean and

12   add all of these 500-plus titles.  That's fine.  If Your Honor

13   agrees that that's something that we need to do, we'll do it

14   but now is the time to sort of sort these things out.  Now is

15   the time that the parties are doing it.  It will take some

16   time.

17          And then the last factor I will note is that I -- and

18   I apologize, Your Honor.  Actually, I think it was in your --

19   one of your earlier orders or it was in something that you said

20   maybe in the first meeting that we had that there is a Ninth

21   Circuit issue going on that could dispose of many of the

22   titles.  That briefing is happening.  We filed our opening

23   brief.  Starz, I think, will be filing its brief at the end of

24   this month or maybe next month -- I'm sorry -- end of next

25   month and then there'll be reply briefing and a hearing that in

41

1    MGM's view will eliminate, if we win in that briefing, 80

2    percent of the titles at issue.

3            Now, leaving aside that, we're still feeling --

4            THE COURT:  Okay.  Hold on, Mr. Srinivasan.  Eighty

5    percent of the entire 761 that -- and I don't mean 761 -- not

6    that that's been established anywhere as a concrete, admissible

7    fact but that seems to be roughly the scope and the number I've

8    heard bandied about at this point.

9            MR. SRINIVASAN:  Well, 80 percent of the 340 that

10   they've put at issue, we think --

11           THE COURT:  Okay.

12           MR. SRINIVASAN:  -- the number -- the percentage will

13   even go higher because our view is the balance have virtually

14   no --

15           THE COURT:  Okay.  I just want to make sure I

16   understand the scope of what you're arguing about.

17           MR. SRINIVASAN:  And to be clear, I should say -- I

18   should revise what I'm saying to some degree.  Eighty percent

19   of the copyright claims because that's --

20           THE COURT:  Okay.

21           MR. SRINIVASAN:  -- what's at issue.  The breach

22   claim remains.  But the breach -- but the copyright claims have

23   a bunch of discovery associated with it that would not have to

24   happen if we prevail and as you know, Judge Gee did say those

25   aspects are stayed.

1          **THE COURT:**  Are stayed.

2          **MR. SRINIVASAN:**  And so we are going to need a period

3    here to catch up with the Ninth Circuit anyway because at some

4    point maybe in the spring, the Ninth Circuit makes its ruling.

5    If we prevail, a bunch of discovery isn't necessary and we

6    could go on to depositions or whatever.  And if we lose, then

7    there will be some more document discovery and just to circle

8    back to what you had said, if I remember, was let's get the

9    document discovery done that's not associated with the Ninth

10   Circuit issue.

11         **THE COURT:**  Absolutely.

12         **MR. SRINIVASAN:**  We'll see what happens.  We'll have

13   to do more discovery or not and then we do depositions.  I

14   think we're still on track for that.  Of course, if --

15   depending on where we go on these other titles and the balance

16   of the library agreement, the dispute we've been talking about

17   at the top, that may implicate the timing because as I

18   mentioned, it could be burdensome.  I don't want to get back

19   into that issue but I think we're proceeding fairly well now

20   that both parties are at the table and being productive I would

21   say as the beginning of this month.

22         **THE COURT:**  All right.  I'm -- this is challenging.

23   You've got part of the case (indisc.).  You've got some of this

24   discovery that may bleed from one issue to the other but I am

25   still firmly of the mind that as much of a document discovery

1    particularly related to the contract claims needs to be moving

2    a pace as well as possible.

3            I think you're now starting to edge in that

4    direction.  I'm really pleased to see more dialogue between

5    you.  I'm not particularly concerned about disagreement between

6    you.  I'm more concerned that you're actually talking about it

7    and that there is some push-and-pull and give-and-take on these

8    issues and that discovery is moving forward.

9            Mr. Earnhardt, I understand and hear your frustration

10   and concern.  It's not -- there's nothing untoward about that

11   and I'm -- and it's not -- I don't think you're being

12   outrageous to be concerned at this juncture but I do think

13   we've got you folks in a position of active engagement right

14   now and I'm going to move as quickly as I can with the matters

15   that are before me to keep this part of the case moving.

16           If at some point, we need -- and I don't think that

17   is today -- I have no problem saying, look, folks, get off the

18   stick and come up with a hundred custodians or a hundred search

19   terms and your connectors or Boolean searches, whatever you

20   want, by X date.  I can do that.  I just don't think we're

21   there yet.

22           We may get there, Mr. Earnhardt.  We may get there

23   because once you come up with those search terms and the

24   ESI-related list of custodians, then you've got to run all

25   those searches and do your deduping and do your identifying and

44

1    check your hashtags and all of that that goes with the

2    mechanics of electronic discovery of which I anticipate --

3    notwithstanding your representations, Mr. Srinivasan, that

4    they've got to look in boxes and cabinets and whatnot for

5    documents.

6          My guess is this is going to be a tremendous amount

7    of electronic discovery produced here.  I don't think we're

8    going to be in Banker's Box land very much.  So it will get

9    done.  I also am sensitive to the time that things are taking

10   but I think if we don't address -- there's nothing worse --

11   doing ESI-related discovery.  I'm not so far removed by the

12   practice that I don't remember what a headache it is with the

13   client but the only thing worse than doing it the first time is

14   having to do it twice because it's either incorrect or not

15   thorough.

16         So let's lay out a path here, I hope, and you can let

17   me know when I'm off the mark in creating more headaches for

18   you than you would otherwise expect to keep you folks on a path

19   that will get this discovery produced hopefully one-and-done.

20   There's always stuff around the outsides or -- and things

21   always turn up.  They always turn up late in discovery like

22   this.  Somebody goes, ah, I didn't know I had kick-out.  I

23   didn't know I -- realize I had the last executed copy of

24   Amendment 6.  Well, produce it.  And that's what the rules say.

25         But the bulk of this discovery needs to be getting

45

1   along right now -- right now.  So let's figure out how many of

2   these titles are going to be the subject of the most

3   fundamental document discovery here from both sides are these

4   -- are the licensing agreements.  So -- but does that --

5           **MR. SRINIVASAN:**  That sounds good, Your Honor.  I

6   just want to make one comment.

7           **THE COURT:**  Get it sorted.

8           **MR. SRINIVASAN:**  That sounds great to MGM, Your

9   Honor.  I just want to make one thing clear for the record and

10   that is, the issue isn't that MGM isn't aware of what its

11   agreements are and its obligations are.  In fact, I --

12           **THE COURT:**  I never suggested that.  You're the one

13   who said it's hard to find this stuff because it's all over the

14   place.

15           **MR. SRINIVASAN:**  What I meant is --

16           **THE COURT:**  It's not necessarily just pushing a

17   button on a database.

18           **MR. SRINIVASAN:**  And I'm saying, I just want to

19   clarify my own comment so my client doesn't get upset with me.

20   What I'm saying is the original agreements, the physical hard

21   copy that was often, like I said, executed years ago which is

22   the process of what we're looking for currently is difficult to

23   find.  In terms of other indicia of those agreements, including

24   the database and things like that, the company does maintain

25   and we do look forward to producing and working with the other

1  side and giving them that.

2         It's -- I just want to -- I did not want to leave the

3  impression that my client wasn't aware of what its obligations

4  were and what its agreements are.  They have that and there are

5  other ways to get that information.  My only point was that

6  getting the copies of the first agreement for some of these

7  licenses which go back decades, that has been the challenge.

8         **MR. EARNHARDT:**  And, Your Honor, if I could just make

9  one point.  Our fundamental point is, someday someone is going

10  to have to look at the actual contracts because that's the

11  claim that we have, is that they licensed these titles to other

12  folks.

13         **THE COURT:**  I understand exactly what your position

14  is, I think, and I understand exactly why you're asking for

15  what you're asking for but my -- what I want to see is legal

16  authority that says they don't have to produce what you're

17  actually asking for and that there is supporting decisions that

18  say it can be more truncated than that because this is a large,

19  sprawling and complex case.

20         But it's still a contract case.  The piece of it

21  we're all actively engaged with right now is still a contract

22  case and it's governed by the four corners of that contract and

23  the subject matter of the contract is what is at issue here.

24  So I don't want to re-plow this ground.  I appreciate

25  everybody's engagement with the Court today but I want to see

1    the briefing on this issue and when we get this sorted, this is

2    going to be a big chunk of the document production.

3            And additional document production, I believe,

4    Mr. Earnhardt, you are chomping at the bit to get?

5            **MR. EARNHARDT:**  Yes, we are.

6            **THE COURT:**  I understand.  I understand that.

7            Okay.  So that was Mr. Earnhardt's side of discovery.

8            Mr. Srinivasan, do you have issues -- I know you guys

9    have been talking.  Do you have issues about discovery

10   following -- particularly following on from the motion to

11   compel, much of which the Court said, go back and talk to each

12   other.  This is overly broad, Starz.

13           **MR. SRINIVASAN:**  We don't, Your Honor.  Frankly, I

14   mean, I was going to echo Mr. Earnhardt's opening comments.  We

15   did have a productive meet-and-confer on September 10th, about

16   a week after the Court's order.  And I also would identify the

17   issue that we've already discussed.  This is probably the major

18   issue between the parties in terms of the scope of this case,

19   the entire library agreement or the titles that they alleged.

20   I do think that will alleviate a lot of the disputes one way or

21   the other.

22           But otherwise, we just received, as I mentioned, a

23   letter from them this morning following up on our meeting.

24   We're going through that but it does appear that the parties

25   are identifying narrow disputes and compromising in other

48

1  places and we look forward to continuing that process.

2           **THE COURT:**  Right.  So here -- I'd like to see your

3  briefing, I think I said, on Monday.  It's not oppositional

4  briefing.  It's going to be cross briefing about positions.

5  The Court will make a decision about that and issue an order

6  with respect to that.

7           I will give you homework before our next regularly

8  scheduled.  So it will be -- our regularly schedule will be 60

9  days from today since we weren't able to meet until today with

10  your status report due every 45 days out.  I would like

11  specifically to hear from the parties where they are on

12  custodians and search terms.

13           And if there are discrete and identifiable issues

14  with search terms and custodians, let's work through those at

15  our next discovery conference because I don't want it to just

16  be sort of vague and rambling.  And this goes to

17  Mr. Earnhardt's concern about timing.  We need to move forward

18  productively here.  Okay?  Which means, keep talking.  So far,

19  so good.

20           All right.  Anything else we need to address today?

21  I think we've got to get this scope of the titles addressed

22  promptly.

23           Mr. Earnhardt, anything else?  Did I miss anything?

24           **MR. EARNHARDT:**  Nothing for Starz, Your Honor.  Thank

25  you very much.

49

1          **THE COURT:**  All right.  Mr. Srinivasan, anything else

2  from MGM?  Did I miss anything from your standpoint?

3          **MR. SRINIVASAN:**  Nothing for us either.  Thank you,

4  Your Honor.

5          **THE COURT:**  All right.  Thank you all very much.

6  Good to see you, Mr. Goldberg and Ms. Anderson.  And, again, my

7  sincere apologies about pushing this off an extra week.  You

8  will not get bumped next time, I hope.  I hope, she says.

9          **MR. SRINIVASAN:**  Thank you very much.

10          **MR. EARNHARDT:**  Thank you, Your Honor.

11          **THE COURT:**  Thank you so much.  Have a good

12  afternoon.

13          **THE CLERK:**  Court is adjourned.

14      **(Proceeding adjourned)**

15

16

17

18

19

20

21

22

23

24

25

## CERTIFICATION

I certify that the foregoing is a correct transcript from the electronic sound recording of the proceedings in the above-entitled matter.

_____                    **September 23, 2021**

Signed                                                          Dated


*TONI HUDSON, TRANSCRIBER*